*407 TEXTO COMPLETO DE LA RESOLUCIÓN
S & D Contractor Inc. (en adelante S & D) recurre ante nos mediante escrito de Certiorari y solicita que revoquemos la Resolución emitida por el Tribunal de Primera Instancia (TPI), Sala de San Juan, el 15 de noviembre de 2004 notificada el 29 de noviembre de 2004. En la misma, el TPI determinó que no procedía el pago de $133,615.47 por concepto de intereses por mora, solicitado por S & D. Llegó a tal determinación luego de analizar las cláusulas pertinentes del contrato suscrito entre S & D y la Autoridad de Edificios Públicos (en adelante Edificios Públicos) actuando como agente de la Administración de Vivienda Pública (en adelante Vivienda). El Estado Libre Asociado de Puerto Rico (en adelante ELA) y Vivienda presentaron su alegato en oposición por conducto del Procurador General.
Analizados los alegatos de las partes, así como el derecho aplicable, resolvemos confirmar la Resolución emitida por el TPI el 15 de noviembre de 2004.
I
El 15 de octubre de 1992, S & D y Edificios Públicos actuando como agente de Vivienda, otorgaron un contrato para la remodelación del Residencial Jardines de Monte Hatillo. La cantidad a pagarse por dicha remodelación ascendía a $21,870,000.00. Se acordó entre las partes que Vivienda, el dueño de la obra, retendría el diez por ciento del monto total de las certificaciones de labor efectuada hasta la aceptación final de la obra. El pago de este retenido se efectuaría una vez el contratista cumpliera con sus obligaciones contractuales y entregara a Vivienda la documentación requerida por la cláusula 10.7.4 del contrato firmado entra las partes.
S & D subcontrató, entre otros, los servicios de All Coating Roof Services/All Coating Management Corp. (en adelante All Coating) para efectuar el trabajo de impermeabilización de techos. Por su parte, el 28 de agosto de 1998, United Surety & Indemnity Company (en adelante United) garantizó mediante fianza y de forma solidaria el cumplimiento de la garantía ofrecida por All Coating. Sin embargo, el 25 de junio de 1999, All Coating, unilateralmente, notificó a S & D que esta fianza fue cancelada debido al paso del Huracán Georges.
La obra fue aceptada el 17 de marzo de 1999, pero Vivienda retuvo el diez por ciento acordado, equivalente a la cantidad de $739,938.33, debido a que S & D incumplió con los términos del contrato luego de entregada la obra. Dicho incumplimiento consistió en que los trabajos de impermeabilización de los ■ techos se hizo deficientemente y no se realizaron las labores de reparación en los mismos requeridas por Vivienda.
El 7 de octubre de 1999, S & D presentó demanda ante el TPI contra All Coating y United solicitando que se les ordenara la reparación y corrección de las deficiencias en la impermeabilización de los techos a tenor con la garantía que se les requirió. En octubre del 2000, enmendó dicha demanda para incluir como co-demandados a Vivienda y al señor José Rivera Trinidad, reclamándoles la suma retenida de $786,740.78. 
*408 El 13 de julio de 2001, S & D presentó una segunda demanda enmendada para incluir como co-demandados al ELA y a Edificios Públicos en su reclamación de la suma retenida. Posteriormente enmienda por tercera vez su demanda para incluir una segunda causa de acción por daños y perjuicios contra todos los co-demandados.
Cuando presenta su cuarta demanda enmendada en enero de 2002 es que por primera vez, en la súplica de la misma, S & D reclama el pago de intereses sobre las sumas reclamadas, a partir de la “fecha en que debieron haber sido pagadas.”
En su solicitud de sentencia sumaria de 13 de marzo de 2002, S & D solicita que se dicte sentencia sumaria parcial a su favor por la suma de $739,938.83, menos la suma de $253,300.00 para la reparación de los techos, para un balance de $486,638.83, más intereses al seis por ciento a partir del 30 de junio de 1998, fecha en que se terminó sustancialmente el proyecto. Posteriormente, el 3 de octubre de 2002, en la súplica de una segunda moción reiterando la solicitud de sentencia sumaria, se solicitaron intereses al seis por ciento a partir de el 13 de juño de 2000.
Luego de varios incidentes procesales, el 2 de marzo de 2004, el TPI ordenó a Vivienda que consignara en el tribunal la cantidad total del retenido, que ascendía a $739,938.33. De esta suma, el TPI retendría la de $259,300.00, para el pago de la reparación de los techos que no se hizo adecuadamente.
Así las cosas, el 20 de abril de 2004, el TPI celebró una vista para considerar la procedencia del pago de intereses. Luego de celebrada ésta se le ordenó a S & D comparecer por escrito en apoyo de su solicitud de pago de intereses, lo cual hizo mediante moción de 23 de abril de 2004. En ésta, esencialmente sostiene que el 14 de junio de 1999, entregó a Vivienda toda la documentación requerida para el pago del retenido y que no habiéndose efectuado el pago, transcurridos 90 días de haber entregado la documentación, la suma adeudada comenzaba a devengar intereses a razón del seis por ciento anual a tenor con la cláusula 10.7.8 del contrato. Por su parte. Vivienda compareció oponiéndose al pago de intereses alegando que es improcedente debido a que S & D nunca entregó todos los documentos requeridos para el pago de la cantidad retenida, tal como lo dispone la cláusula 10.7.4 del contrato.
Considerados los escritos de las partes, el 15 de junio de 2004, el TPI ordenó a S & D que mostrara causa por la cual no se debía denegar su solicitud de pago de intereses en la medida en que no había cumplido con la entrega de los documentos requeridos en el Artículo 10.7.4 del contrato.
El 29 de junio de 2004, S & D presentó una “Moción en Cumplimiento de Orden dictada el 15 de junio de 2004”. Acompañó la misma con varios anejos, entre éstos una declaración jurada en ía cual expresó que aún tenía deudas con los subcontratistas Enio J. Vélez, All Coating y Rejas González.
El 15 de noviembre de 2004, el TPI emitió la Resolución recurrida, la cual fue notificada el 29 de noviembre de 2004. El 13 de diciembre de 2004, S & D solicitó la reconsideración de la referida Resolución. No habiéndose pronunciado el TPI en cuanto a la-misma, S & D recurre ante nos mediante-escrito de Certiorari el 29 de diciembre de 2004.
II
En su recurso de certiorari, S & D nos señala que:

“Erró el Tribunal de Primera Instancia al resolver que S & D no tiene derecho a intereses por mora sobre el retenido del proyecto, a pesar de la existencia de una cláusula contractual a esos efectos y a que el contratista cumplió con los requisitos impuestos por la AVP para efectuar el pago del retenido desde el 14 de junio de 1999.

*409
Erró el Tribunal de Primera Instancia al interpretar la cláusula 10.7.8 del contrato entre la Administración de Vivienda Pública y S & D Contractor, Inc. a favor de la entidad pública, a pesar de que el contrato es, a todas luces, uno de adhesión. ”

Entendemos que el TPI no cometió los errores señalados por los fundamentos que pasamos a discutir.
III
Los contratos son negocios jurídicos bilaterales que constituyen una de las fuentes de las obligaciones. Amador Parrilla v. Concilio Iglesia Universal de Jesucristo, 150 D.P.R. 571, 581 (2000). Los contratos existen desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio. Art. 1206 del Código Civil, 31 L.P.R.A. secc. 3371; Amador Parrilla v. Concilio Iglesia Universal, supra. Así, según el Art. 1206 del Código Civil de Puerto Rico, 31 L.P.R.A. secc. 3371, se reputa existente el contrato: “desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio. ” En tal sentido, es todo contrato un negocio jurídico que contiene un elemento de bilateralidad. Santiago Nieves v. A.C.A.A., 119 D.P.R. 711 (1987). Existe un contrato cuando concurren los siguientes requisitos: (a) consentimiento de los contratantes; (b) objeto cierto que sea materia del contrato, y (c) causa de la obligación que se establezca. Art. 1213 del Código Civil, 31 L.P.R.A. secc. 3391; Díaz Ayala v. E.L.A., 2001 J.T.S. 49. Una vez concurren las condiciones esenciales para su validez, los contratos son obligatorios. Art. 1230 del Código Civil, 31 L.P.R.A. secc. 3451.
Los contratos son fuente de obligación que se perfeccionan desde que las partes contratantes consienten voluntariamente a cumplir con los términos de los mismos. Las partes contratantes no solamente se obligan a lo pactado, sino también a toda consecuencia que sea conforme a la buena fe, al uso y a la ley. Art. 1210, Código Civil, 31 L.P.R.A secc. 3375. Véase además: Irizarry López v. García Cámara, 2001 J.T.S. 164, alapág. 456. El consentimiento se manifiesta por el.concurso de la oferta y la aceptación sobre la cosa y la causa que ha de constituir el contrato. Art. 1214 del Código Civil, 31 L.P.R.A. secc. 3401; Prods. Tommy Muñiz v. COPAN, 113 D.P.R. 517, 521 (1982).
Los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarias a las leyes, a la moral, ni al orden público. Art. 1207 Código Civil, 31 L.P.R.A. secc. 3372. Véase además: Irizarry López v. García Cámara, supra; Trinidad García v. Chade, 2001 J.T.S. 10; Luán Investment Corp. v. Rexach Construction Co., Inc, 2000 J.T.S. 196; Amador Parrilla v. Concilio Iglesia Universal de Jesucristo, supra. Las obligaciones que nacen de los contratos tienen fuerza de ley entre las paites contratantes, y deben cumplirse al tenor de los mismos. Art. 1044 del Código Civil, 31 L.P.R.A. secc. 2994. De conformidad con el principio rector de pacta sunt servanda, las partes contratantes se obligan a todos los extremos de lo pactado que sean conformes a la ley, a la moral y al orden público.
En materia de interpretación de los contratos, nuestro ordenamiento civil establece como principio que si los términos de los contratos son claros y no dejan duda sobre la intención de los contratantes, se atenderá al sentido literal de sus cláusulas. Art. 1233 del Código Civil, 31 L.P.R.A. secc. 3471; CNA Casualty of P.R. v. Torres Díaz, 141 D.P.R. 27 (1996). La jurisprudencia estima por términos claros aquéllos que por sí mismos son bastante lúcidos para ser entendidos en un único sentido, sin dar lugar a dudas, controversias ni diversidad de interpretaciones y sin necesitar para su comprensión, razonamientos o demostraciones susceptibles de impugnación. Sucn. Ramírez v. Tribunal Superior, 81 D.P.R. 357 (1959).
Señala el Art. 1240 del Código Civil, 31 L.P.R.A. secc. 3478, que al interpretar cláusulas obscuras, no deberá favorecerse a la parte contratante que hubiese ocasionado tal oscuridad. Por lo tanto, es norma asentada que las ambigüedades deberán ser interpretadas en contra de la parte que lo redactó. Id., González v. Coop. Seguros de Vida de P.R., 117 D.P.R. 659 (1986).
*410 La mencionada norma de interpretación contractual aplica con mayor fuerza cuando se trata de contratos de adhesión. Herrera v. First Nat’l City Bank, 103 D.P.R. 724, 727 (1975). Un contrato de adhesión es aquél en que sólo una de las partes dictó las condiciones del acuerdo. Zequeira v CRUV, 83 D.P.R. 878 (1961). Como es sabido, en los contratos de adhesión una de las partes establece sus términos y condiciones, mientras que la otra únicamente puede adherirse o rechazar- el mismo. Picazo Diez L., Fundamentos de Derecho Civil Patrimonial, Madrid, Editorial Civitas, 5a ed., 1996, Vol. I, pág. 139; Vázquez Bote E., Tratado Teórico Práctico y Crítico del Derecho Privado Puertorriqueño, New Hampshire, Equity, 1992, Vol. IX, págs. 19-20. Dicho de otra forma, los contratos de adhesión:
“[s]on aquéllos en que una de las partes contratantes no interviene en negociación previa alguna, porque la otra parte redactó el contrato, imponiendo sus propias condiciones, deforma que la parte no colabora en la formación del contenido del contrato. En esta forma, la parte que no interviene acepta el contrato tal como se lo presenta la otra parte. Por ello se dice que se ‘adhiere ’ al esquema predeterminado unilateralmente. ” J. R. Vélez Torres, Curso de Derecho Civil: Derecho de Contratos, San Juan, Rev. Jur. U.I.P.R., 1990, T. IV, Vol. II, pág. 7.
Por consiguiente, en los contratos de adhesión, una sola de las partes dicta las condiciones que ha de aceptar la otra. Quiñones López v. Manzano Pozas, 141 D.P.R. 139 (1996). Por lo que se da, anómalamente, una reducción al mínimo de la bilateralidad contractual. Zequeira v. CRUV, supra.
En nuestra jurisdicción, los contratos de adhesión son tratados de modo especial, pero ello no significa que éstos deban ser siempre interpretados liberalmente en favor de la parte más débil y mucho menos que tales pactos estén viciados de nulidad. Arthur Young v. Vega, 136 D.P.R. 157 (1994); Casanova v. P.R. Amer. Ins. Co., 106 D.P.R. 689, 697 (1978). La mera desigualdad económica entre las partes no hace que el contrato sea uno de-adhesión-, ya -que lo usual es que las-paites contratantes no están en igual posición, económica. Consolidated v. Cooley, 103 D.P.R. 6, 9 (1974). Por consiguiente, la adhesión tampoco implica o conlleva la nulidad del contrato. Casanova v. P.R. Amer. Ins. Co., supra.
En ausencia de ambigüedad u oscuridad, el contrato de adhesión debe ser atendido según sus términos. Arthur Young v. Vega, supra; Casanova v. P. R. American Ins. Co., supra. Cuando los términos y condiciones del contrato de adhesión son claros, específicos y no dan margen a diferentes interpretaciones, así deben aplicarse. García Curbelo v. A.F.F., 127 D.P.R. 747, 760 (1991).
Mediante el contrato de arrendamiento de obras, una paite se obliga hacia la otra.a ejecutar una obra a cambio de la contraprestación convenida. Artículo 1434 del Código Civil, 31 L.P.R.A secc. 4013. El Tribunal Supremo ha definido el contrato de arrendamiento de obras “como esencialmente uno de trabajo, mediante el cual una de las partes se encarga de hacer una cosa para la otra, mediante un precio convenido entre ellos. (...) Ahora bien, no hay duda que el contrato de obra es uno de carácter consensual, bilateral, y oneroso cuyos elementos característicos son la obra a realizarse y el precio. ” Constructora Bauzá v. García López, 129 D.P.R. 579 (1991); Master Concrete v. Fraya, 2000 J.T.S. 192.
El dueño de la obra tiene la obligación fundamental de pagar el precio de ésta en la forma, cuantía y tiempo convenido. Albaladejo Manuel, Derecho Civil II, Derecho de Obligaciones Vol. II, Los contratos en particular y las obligaciones no contractuales, lOma edición, 1997, Bosch, Barcelona, págs. 286 y ss. De no haber pacto o costumbre en contrario, el pago deberá hacerse al momento de la entrega de la obra. Artículo 1490 de Código Civil, 31 L.P.R.A. secc. 4132. El contratista, por su lado, tiene la obligación de realizar y entregar la obra según lo pactado. “El contratista viene obligado a ejecutar la obra conforme a lo convenido en el contrato, a las reglas del arte de la construcción y a los usos o reglas profesionales.” Master Concrete v. Fraya, supra. Así mismo, si los términos del contrato son claros y no dejan dudas sobre la intención evidente de los contratantes, se estará al sentido literal de sus cláusulas. Artículo 1233 del Código Civil de Puerto Rico, 31 L.P.R.A. 3471; *411 véase también: Master Concrete v. Fraya, supra.
El Tribunal Supremo ha resuelto que “en nuestra jurisdicción, el principio rector en materia de contratos es la libertad de contratación entre las partes”. Municipio de Ponce v. Gobernador, 136 D.P.R. 776, 787 (1994). Los pactos entre las contratantes tienen fuerza de ley y deben ser cumplidos. López Torres v. González Vázquez, 2004 J.T.S. 179. Está resuelto que el Estado es un contratista como cualquier otro. Municipio de Ponce v. A.E.E., 2001 J.T.S. 3.
Cuando los términos de un contrato son claros y no dejan lugar a dudas sobre la intención de los contratantes, no cabe recurrir a reglas de interpretación. Art. 1233 del Código Civil, 31 L.P.R.A secc. 3471; Irizarry López v. García Cámara, supra; Trinidad García v. Chade, 2001 J.T.S. 10; Marcial Burgos v. Tomé, 144 D.P.R. 522, 536 (1997). Al respecto, establece el Artículo 1235 del Código Civil, 31 L.P.R.A. secc. 3473, que “[cjualquiera que sea la generalidad de los términos de un contrato, no deberán entenderse comprendidos en él cosas distintas y casos diferentes de aquéllos sobre que los interesados se propusieron contratar." Además, el Artículo 1236 del Código Civil, 31 L.P.R.A. secc. 3474, dispone que: “[s]i alguna cláusula de los contratos admitiere diversos sentidos, deberá entenderse en el más adecuado para que produzca efecto. ” Por lo tanto, si bien hay que considerar la intención de las partes para interpretar los contratos, la interpretación tiene que ser cónsona con el principio de la buena fe y no puede llevar a resultados incorrectos, absurdos e injustos. Tampoco puede llevar a resultados contrarios al texto del contrato. Irrizary López v. García Camara, supra.
Las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes, por lo que se debe cumplir con lo expresamente pactado. Artículo 1044 del Código Civil, 31 L.P.R.A. secc. 2994. Por tanto, los tribunales de justicia no pueden relevar a una parte de cumplir con lo que se obligó a hacer mediante contrato cuando dicho contrato es legal y válido, y no contiene vicio alguno. De Jesús González v. A.C., 148 D.P.R. 255, 271 (1999); Mercado Quilinchini v. U.C.P.R., 143 D.P.R. 610, 627 (1997); Cervecería Corona v. Commonwealth Ins. Co., 115 D.P.R. 345, 351 (1984); Olazábal v. U.S. Fidelity, etc., 10 D.P.R. 448, 462 (1975).
En el presente caso está -envuelto el desembolso de fondos públicos. Se ha resuelto, pues, que la buena administración de un gobierno es una virtud de democracia y parte de su buena administración implica llevar a cabo sus funciones como comprador con eficacia, honestidad y corrección para proteger los intereses y dinero del pueblo. Ríos v. Municipio de Isabela, 2003 J.T.S. 123. Igualmente, se ha resuelto que las distintas disposiciones estatutarias que regulan la realización de obras y construcción de servicios para el Estado y sus agencias e instrumentalidades tienen por meta la protección de los intereses y dineros del pueblo contra el dispendio, la prevaricación, el favoritismo y los riesgos del incumplimiento. Cancel v. Municipio de San Juan, 101 D.P.R. 296, 300 (1973).
El caso de De Jesús González v. A.C., 148 D.P.R. 255 (1999), estableció lo siguiente:
“Por otro lado, cuando la contratación involucra el uso de bienes o fondos públicos, hemos insistido, además, en la aplicación rigurosa de todas las normas pertinentes a la contratación y desembolso de esos fondos, a los fines de proteger los intereses y dineros del Pueblo. Hemos enfatizado que el manejo prudente de fondos públicos está saturado de intereses de orden público. Hemos resaltado normativamente la imperiosa necesidad de evitar el dispendio, la extravagancia, el favoritismo y la prevaricación en los contratos gubernamentales. Ciertamente, al interpretar el sentido contemporáneo de la disposición del Código Civil que requiere que los contratos no sean contrarios al orden público, no podemos ignorar que en la contratación por el Estado, la sana y recta administración de los fondos del Pueblo está revestida del más alto interés público, y que todo organismo gubernamental está obligado a observar cabalmente la esencia del principio consagrado en la See. 9 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, de que los fondos públicos sólo pueden gastarse para fines públicos legítimos. Como hemos señalado, todas las actuaciones del Gobierno están siempre circunscritas por la Constitución. El Gobierno, como contratante, *412 sigue siendo el Gobierno, y no puede actuar de un modo que esté reñido con los principios que encarna el orden constitucional. C.R.U.V. v. Peña Ubiles, supra, págs. 315-317. El concepto del "orden público" del Art. 1207 del Código Civil, supra, pues, incluye en su contenido no sólo la prohibición de cláusulas contractuales abusivas o leoninas discutidas antes, sino también la política pública de origen constitucional que preconiza el uso escrupuloso de los fondos públicos”
IV
En el caso ante nos, S & D entró en una relación contractual con Vivienda para la remodelación del Residencial Jardines de Monte Hatillo. Dicho contrato establecía las pautas que habrían de regir la relación de las partes. Las cláusulas del contrato de mayor pertinencia a la controversia ante nos son la 10.7.4 y la 10.7.8. La cláusula 10.7.4 establece:

“Neither the final payment nor the remaining retained percentage shall become due until the Contractor submits to the Owner: (1) an Affidavit that all payrolls, bills for materials and equipment, and other indebtedness connected with the work for which the Owner or his property might in any way responsible, have been paid or otherwise satisfied, (2) consent of surety to final payment, and (3) if required by the Owner, other data establishing payment or satisfaction of all such obligations, such as receipts, releases and waivers of liens arising out of the Contract, to the extent and in such form as may be designated by the Owner. If any Subcontractor refuses to furnish a release or waiver required by the Owner, the Contractor may furnish a release a bond satisfactory to the Owner to indemnify him against any such lien. If any such lien remains unsatisfied after all payments are made, the Contractor shall refund to the Owner all moneys that the latter may be compelled to pay in discharging such lien, including all costs and reasonable attorney’s fees. ”

Por su parte, la cláusula 10.7.8 establece lo siguiente:

“Should final payment not be made within the ninety (90) calendar days after the Contractor has submitted all the documents required for final payment for those items mutually accepted by both parties, interest at the rate of six (6) percent per annum will be paid to the Contractor for the period beginning on the 91st-day after the Contractor has submitted the documents required for final payment and extending to the date the final estimate is paid. ”

S & D y Vivienda suscribieron un contrato el cual ambos vienen obligados a cumplir. Es norma reiterada que los contratos tienen fuerza de ley entre las partes, por lo cual una vez entran en la relación contractual vienen obligados a cumplir los términos del contrato. Quiere decir, pues, que tanto S & D como Vivienda venían obligados a cumplir todas las cláusulas del contrato suscrito. Hemos señalado que en materia de interpretación de los contratos es norma establecida que si los términos de los contratos son claros y no dejan duda sobre la intención de los contratantes, se atenderá al sentido literal de sus cláusulas.
Analizadas las cláusulas en controversia, encontramos que las misma son claras a] establecer que. Vivienda no entregará el dinero retenido hasta tanto S & D cumpla con la entrega de todos los documentos requeridos para el pago final. Específicamente se dispone en la cláusula 10.7.4, que S & D, entre otros documentos, debía someter una declaración jurada estableciendo que había pagado cualquier deuda relacionada con el trabajo realizado incluyendo los subcontratistas y proveedores de materiales.
De los mismos escritos radicados por S & D ante el TPI, surge que aún en el año 2004, S & D tenía deudas pendientes con varios subcontratistas. En la Moción solicitando Sentencia Sumaria, radicada por S & D el 7 de octubre de 2002, éste reconoce que a esa fecha todavía debía dinero a los siguientes subcontratistas: Enio Vélez, Zep Furniture, All Coating Roof y Rejas González. El total de las deudas pendientes a esta fecha ascendía a $73,227.14.
*413 Igualmente, en la Moción en Cumplimiento de Orden dictada el 15 de junio de 2004, radicada el 6 de julio de 2004, S & D acompaña una declaración jurada donde acepta una vez más que aún tenía deudas pendientes con los subcontratistas antes mencionados. Una vez Vivienda consignó el dinero en cumplimiento de las ordenes del TPI, S & D radicó una moción para retirar el dinero consignado. Sin embargo, el 29 de noviembre de 2004, el TPI ordenó a la Unidad de Cuentas del TPI de San Juan que expidiera un cheque a nombre de Enio Vélez, otro a nombre de Rejas González y el restante que fuera expedido a favor de S & D. Esta orden hace evidentemente claro que para el 15 de noviembre de 2004, S & D todavía tenía deudas pendientes con varios subcontratistas.
Ante este cuadro, forzoso es concluir que S & D no había cumplido con lo estipulado en el contrato firmado por ambas partes, ya que hasta el año 2004 no había podido proveer una declaración jurada estableciendo que no adeudaba dinero a subcontratistas o proveedores. El contrato claramente establece en su cláusula 10.7.8 que el dueño de la obra entrará en mora 90 días después de que el contratista hubiese entregado todos los documentos requeridos para el pago.
Más aún, Vivienda envió una carta a S & D (véase carta del 23 de marzo del 2000, Exhibit VI folio 170 de escrito de certiorari) por conducto de su representante legal, donde le especificó los documentos que aún no habían sido entregados y que impedían la liquidación de la suma retenida. Como uno de los documentos pendientes de entrega le requirió que sometiera una carta de la compañía aseguradora indicando que las deudas pendientes de pago a los subcontratistas serían garantizadas en su totalidad en caso de que se le entregara el dinero a S & D y ésta no les pagara. La carta responsiva remitida por Insurance Company of North America (Surety) (véase carta del 13 de julio de 2000, Exhibit XVII folio 250 del escrito de certiorari), no contenía la garantía solicitada por Vivienda. Por el contrario, establecieron que de una investigación reciente se desprendía que varios sub-contratistas y proveedores aún no habían sido pagados y que el pago a estos acreedores tenía que efectuarse previo a que ellos pudieran emitir su consentimiento para el pago del retenido. Ciertamente esta no era la garantía requerida por Vivienda.
Resulta evidente que Vivienda no podía entrar en mora cuando S & D no había cumplido a cabalidad con las cláusulas del contrato. Por tal razón no se cometió el primer error señalado por la parte apelante.
Como segundo error nos señala S & D que el contrato en cuestión es uno de adhesión por lo cual debe ser interpretado a su favor. No le asiste la razón, veamos.
Si bien se resolvió en el caso de Zequeira v. CRUV, supra, que el contrato de obra pública es un típico contrato de adhesión, también se ha resuelto que en ausencia de ambigüedad u oscuridad, el contrato de adhesión se atenderá según sus términos. Establecida la norma, procede interpretarlas cláusulas 10.7.4 y 10.7.8 del contrato en controversia, según sus términos.
Ambas cláusulas son claras al establecer que para que el pago del retenido proceda, deberá el contratista cumplir con la entrega de ciertos documentos al dueño de la obra. Para que entre en vigor el pago de intereses en caso de mora, es necesario que se hayan entregados los documentos requeridos por el dueño. Cuando se firmó el contrato, las partes se obligaron a cumplir todas las condiciones impuestas en el mismo. Una de esas condiciones era que S & D debía pagar todas las deudas contraídas en la realización de la obra y acreditar a Vivienda que las mismas fueron satisfechas.
S & D no cumplió con los términos a los cuales se obligó al no someter varios documentos, entre ellos, las declaraciones juradas sobre la no existencia de deudas hacia los subcontratistas y proveedores de materiales, por lo cual no procedía el pago del retenido y mucho menos el de intereses.
Anteriormente establecimos que se debe ejercer mayor cautela con los contratos en los cuales están *414 envueltos fondos públicos. La rigurosidad ejercida por Vivienda en el cumplimiento de las cláusulas del contrato previo al desembolso de fondos públicos está a tono con la política vigente.
Ante todo lo anteriormente discutido, resulta claro que los intereses reclamados por S & D no proceden, ya que Vivienda nunca entró en mora. Además, que las cláusulas del contrato son claras y no dejan duda sobre la intención de los contratantes. El pago del balance retenido procedió una vez S & D se allanó a que se emitieran cheques por el TPI para pagar directamente a los sub-contratistas o proveedores de materiales y se descontó del retenido la suma de $259,300.00, para garantizar el pago de los arreglos de las filtraciones en los techos. Antes de esto es innegable que S & D no había podido cumplir con lo requerido por Vivienda a tenor con la cláusula 10.7.4 del contrato firmado entre las partes y por lo tanto nunca se activó la cláusula 10.7.8.
V
Por los fundamentos antes expuestos, se expide el auto y se confirma la Resolución emitida por el TPI el 15 de noviembre de 2004. Se devuelve el caso para ulteriores procedimientos.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.
Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones